**In the Interest of B.K.K., A Minor Child,**

**P.K., Natural Mother, Appellant,**

**State of Iowa, B.K.K., and Grandparents, Appellees.**

**No. 92–700.**

Supreme Court of Iowa.

May 19, 1993.

Rehearing Denied June 16, 1993.

C. Jean Pendleton of Charnetski, Olson, Lacina & Pendleton, Grinnell, for appellant.

Bonnie J. Campbell, Atty. Gen., John M. Parmeter, Special Asst. Atty. Gen., and Kathrine S. Miller–Todd, Asst. Atty. Gen., for appellee State.

Donald L. Schild of the Schild Law Office, Grinnell, atty. and guardian ad litem for appellee B.K.K.

Theodore R. Hoglan and Marie A. Condon of Fairall, Fairall, Kaplan, Hoglan, Condon & Klaessy, Marshalltown, for appellees grandparents.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, LAVORATO, and ANDREASEN, JJ.

HARRIS, Justice.

The district court ordered termination of the relationship between a mother and her daughter, now six and one-half years old. On the mother's appeal, we find that termination is required and affirm. So doing, we vacate a court of appeals decision to the contrary.

Much of the State's necessary showing has been conceded. Termination was sought pursuant to Iowa Code section 232.-116(1)(e) (1991).[1] The mother concedes, and the record clearly shows, that the first three items are established. The dispute is over the fourth item, whether the child can now be reunited with her mother.

That crucial question is to be answered, of course, on the basis of the mother's wherewithal to function as a parent at the present time. Past failures must be explored though because they are germane to any extent they cast light on what the child would now face upon reunification.

Details are at once shocking and frightening. The matter first came to the attention of authorities when the child was just four years old. At the time she was in her mother's sole care and was taken by her mother to a hospital for an acute vaginal injury. The child readily submitted to the examination, an indication of prior abuse. The examination revealed that the child recently had been sexually abused by penetration, and also had been similarly abused more than one or two times at least several months previously. Later, during therapy, the child indicated that she had been abused vaginally by an adult man and an adult woman, neither of whom were identified.

The mother ascribed the precipitating incident of abuse to a baby-sitter. She however told an acquaintance that the child had been abused by one of the two or three men (one, apparently, an escaped prison convict) who lived with her. We, like the trial court, believe the child was abused by one of them.

---

1. Iowa Code § 232.116(1)(e) (1991) provided that termination may occur if:
    The court finds that all of the following have occurred:
    (1) The child is four years of age or older.
    (2) The child has been adjudicated a child in need of assistance pursuant to section 232.-96.
    (3) The custody of the child has been transferred from the child's parents for placement pursuant to section 232.102 for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
    (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.
This section has since been amended. The amendment does not bear on the questions raised in this appeal.

The mother, whose IQ is 80 (low average intelligence or borderline retarded), blamed neither herself nor any of the men with whom she lived, but the child's father who, she said, should have "stuck around." This refusal or inability to face up to her parental responsibilities looms large over the entire record. The crux of the matter was aptly summarized in the mother's psychological report. It stated the mother is

a person who is likely to have exhibited a history of poor interpersonal relationships, acting out against parental or societal rules and standards, and in general resentment of authority. Typically there is considerable underlying anger and resentment toward authority and generally poor impulse control. Women with this profile often show a history of alcohol over-indulgence, brief sexual liaisons, truancy, and other relatively socially unacceptable behaviors. Because of their irritability, suspiciousness, introversion, and emotional shallowness they have difficulty establishing positive long-term relationships. They often manifest poor work records and are not good candidates for change via psychotherapy. This is particularly the case as they tend to rationalize problems and to blame problems on to others rather than seeing themselves as responsible and needing to change.

A no-contact order was entered prohibiting association between mother and daughter. Counselors advised the court that any contact with the mother would damage the child's progress through therapy.[2] The child and mother entered separate therapy programs. The child responded very well; the mother made "significant progress for three months."

Reunification was explored. On November 2, 1990, the dispositional order was amended to allow the mother to visit with the child as arranged and supervised by a named clinical social worker. On January 24, 1991, the social worker reported that the supervised contacts took place for three

months with some success. The success, though, was not an unqualified one. The supervising social worker reported that one visit

was suspended because of [the mother's] inappropriate response to [the child's] behavior. [The mother] said at that last session [the child] was being a brat and [the mother] told her to stop lifting the edge of a table. When [the child] didn't comply, [the mother] told her if she was going to act that way she didn't want anything to do with her and didn't want to see her anymore. When I asked [the mother] how she thought that comment might have felt to [the child], [the mother] said it didn't phase her. When I asked what she thought it meant that [the child] ran and hid under a table, [the mother] said [the child] did that because she didn't know ... the social worker. In the session today [the mother] said it was my fault that [the child] hid under the table because I had asked that the visitation change from my office to somewhere else and that [the child] wouldn't have done that in my office at a familiar setting.

I told [the mother] that [the child] would no doubt do more things that she doesn't like and wondered how she would handle them. [The mother] admitted she probably shouldn't have said that to [the child] and that in her therapy she has worked on some new ideas to use. I asked [the mother] to tell me what they are and she refused. I explained why I wanted to know as the supervising person for visitation and she still refused. She never did tell me.

During the period of scheduled visits, the mother had largely spurned her own scheduled therapy sessions, keeping two appointments and having rescheduled or failed to appear for the last six. The mother viewed the sessions as not needed and nonproductive. Predictably, she thought the problem was with the department of human services rather than with herself.

2. Because of the mother's violation of the order on at least one occasion, she was cited for and found to be in contempt. No punishment was prescribed, and we do not rest our decision on the violation.

The child's therapist continued to report that the no-contact order was vital to the child's progress. Orders were entered February 15, 1991, and July 5, 1991, both finding the child could not be returned home without suffering harm.

In urging reversal the mother contends that the efforts of the department of human services have not been adequate. It is easy to sympathize with the mother's present perception that not enough was done to build her parenting skills. In her heart-breaking situation it is quite understandable for the mother, with hindsight, to believe that additional efforts somehow could have equipped her with at least minimal parenting abilities. In our view the department's efforts were more than adequate and exhausted every reasonable possibility of achieving the change we are convinced was impossible.

We reject the suggestion also because it comes too late. Termination proceedings should not be voided on such a basis. The scheme now suggested would call for voiding the entire process when, later in court, the department can be second-guessed on the basis of services first suggested after the fact. Suggestions are due far earlier in the process.

The fundamental fact is that the mother, tragically, will not, and in all probability cannot, remedy her immaturity. Shortly before the termination hearing a social worker reported that she had lived in seven different places in the preceding two and one-half years. She was unemployed. At trial her last prior employment was as a waitress in a topless bar. She was again pregnant. To one worker she named a certain man as the father, but told another official that the father was unknown. No one, not even the mother, contends the child can be surrendered to the mother's care at this time. The mother admits this would not be appropriate, or even safe for the child. The mother asks only to be awarded four visits per year. She stated supervised visits would be acceptable.

We terminated a mother's parental interests on less egregious facts in *In re A.C.,* 415 N.W.2d 609 (Iowa 1987). There, too, a mother, wholly lacking in minimal parental skills, and with no realistic ability to develop them, nevertheless asked for more time. We pointed out:

> It is unnecessary to take from the children's future any more than is demanded by statute. Stated otherwise, plans which extend the twelve-month period during which parents attempt to become adequate in parenting skills should be viewed with a sense of urgency. Of course some suggested extensions will prove to be appropriate. The judge considering them should however constantly bear in mind that, if the plan fails, all extended time must be subtracted from an already shortened life for the children....

*Id.* at 614.

The child has long been bonded to her paternal grandparents. Even prior to the intervention of the court the paternal grandparents took care of the child sixty to eighty percent of the time. Adoption by the grandparents is a likely possibility.

We emphatically agree with the district court that a case for termination was established by clear and convincing evidence. Indeed the record could support no other conclusion. The facts constitute the textbook example for termination outlined in Iowa Code section 232.116(1)(e). The child cannot be asked to continue in a relationship with the mother whose tragic deficiencies are so hopelessly inadequate that it is obvious they will not improve.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**