**IN THE COURT OF APPEALS OF IOWA**

No. 24-0111
Filed May 8, 2024

**IN THE INTEREST OF F.W.,**
**Minor Child,**

**R.G., Father,**
　　Appellant.
_____

　　Appeal from the Iowa District Court for Ringgold County, Monty Franklin, Judge.

　　A father appeals the termination of his parental rights. **AFFIRMED.**

　　Ivan E. Miller, Red Oak, for appellant father.

　　Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

　　Dusty Clements of Clements Law & Mediation, Newton, attorney and guardian ad litem for minor child.

　　Considered by Tabor, P.J., and Badding and Buller, JJ.

**BULLER, Judge.**

The father appeals termination of his parental rights to F.W. (born 2019). The child lived her first few weeks with the mother, then started living with the paternal grandmother around one month later. The father occasionally saw the child during this time but went to prison in Missouri shortly after the child's birth. The mother (whose rights were terminated but has not appealed) was sentenced to prison shortly thereafter and indicated she wanted nothing to do with the child. The paternal grandmother was granted guardianship in July 2021 over the father's objection.

When the father was released from one of his periods of incarceration, he visited with the child "here and there" at the grandmother's home with mixed results and only one overnight visit on the child's second birthday. During that visit, the father attempted to barricade himself and the child in the basement—resulting in officers arresting him and new criminal charges. The father returned to prison shortly after this incident and remained incarcerated through the termination trial. In total, the father has been jailed or imprisoned for the majority of his adult life and most of the child's life.

In the grandmother's words, the father "can be a good man. He can be. But he can't stay out of prison." And "you can't be a dad when you're locked up all the time." She also described the father as an addict, explaining how he could not quit using controlled substances. The father's own testimony largely echoed this observation, noting he had been using drugs his "whole life." Records from the underlying child in need of assistance (CINA) case revealed the father's drug use

started at age ten and involved marijuana, methamphetamine, and prescription drugs.

In January 2023, the Iowa Department of Health and Human Services (HHS) removed the child from the grandmother's home due to concerns unrelated to this appeal, and the juvenile court adjudicated F.W. a CINA in March. As part of the permanency plan, the court ordered the parents to participate in services—including substance-abuse and mental-health evaluations and treatment.

By the termination trial, the father still had not completed a substance-abuse or mental-health evaluation or engaged with services, despite widespread agreement as to his nearly lifelong and significant drug problem. For at least some portion of his time in prison, the father was in segregated or restricted custody, and he indicated he could not obtain adequate services through the Missouri correctional system. (The father claimed he "voluntarily" placed himself in segregation, but this was not independently corroborated by other record evidence.) While in segregation, the father could not access a phone for contact with the child. An HHS worker testified it was impossible for Iowa HHS to provide many services to offenders incarcerated in Missouri. The juvenile court found the father's failure to address the substance-abuse and mental-health concerns meant that returning the child to his care would result in multiple adjudicatory harms.

There is conflicting evidence on when the father's prison sentence will end. His total sentence appears to be for seven years with a completion date in 2026. A Missouri Department of Corrections document denying release in 2023 indicated the father may be released in May 2024 subject to continued good behavior and an acceptable release plan, but that same document noted:

**There does not appear to be a reasonable probability at this time that you would live and remain at liberty without again violating the law based upon: History of prior criminal involvement, Poor field supervision history, Need for institutional substance abuse treatment, [and] Poor institutional adjustment.

In any event, the juvenile court found the father's failure to engage with substance-abuse or mental-health services meant—at minimum—it would be "numerous months following his release" before the father would be a safe placement for the child. And the father admitted in his own testimony it would have to be a "slow reintegration process" before he could care for the child. The record does not contain the exact restrictions the father would face on parole and is somewhat inconsistent as to the exact charges that led to his current incarceration—though there is agreement he has been incarcerated at some point for offenses related to burglary, domestic abuse, forgery, controlled substances, harassment, and various misdemeanors.

In the eighteen months before termination, the father had no contact with the child. An HHS worker testified—and no party disputed—that the department wanted to get the child into therapy and receive "therapeutic feedback" about visits before they took place. The juvenile court found the father "ha[d] not developed a bond with the child" and "has no parent-child relationship with" the child, who referred to the grandmother's paramour and her foster dad as the father figures in her life.

The child's grandmother testified the father had not sent correspondence, cards, letters, or anything else to the child while he was incarcerated, though he did send letters via HHS after the CINA case was underway. She also explained how the father never provided any financial assistance for the child while he was

in or out of prison. The grandmother's paramour confirmed they had been the child's sole source of financial support. But the father disputed this version of events, asserting he provided cash and "supplied all of [the child's] diapers and wipes and anything else that she needed." The father's testimony on this point was undercut to some extent by a previous interview with HHS, in which he disclosed paying child support for another child but not F.W. At trial, the father also contested the grandmother and her paramour's description of the barricaded-in-the-basement event that led to his arrest and incarceration, claiming the police "just decided to place [him] under arrest" for no reason and he pled guilty even though he "could [have] eventually beat" the charge.

As of trial, the child was doing well in foster care, and HHS was working to rebuild her relationship with her grandmother. Both the foster parents and grandmother indicated they were willing to adopt. The county attorney, HHS, and the child's guardian ad litem all recommended termination.

The juvenile court terminated the father's parental rights under Iowa Code section 232.116(1)(b) and (e) (2023). He appeals, and we review de novo. *See In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021).

**Statutory elements.** "When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record." *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). We elect to affirm under paragraph (b). Under this section, the juvenile court was required to find "there is clear and convincing evidence that the child has been abandoned or deserted." Iowa Code § 232.116(1)(b). Both terms— "abandoned" and "deserted"—are statutorily defined:

> "Abandonment of a child" means the relinquishment or surrender, without reference to any particular person, of the parental rights, duties, or privileges inherent in the parent-child relationship. Proof of abandonment must include both the intention to abandon and the acts by which the intention is evidenced. The term does not require that the relinquishment or surrender be over any particular period of time.

*Id.* § 232.2(1).

> "Desertion" means the relinquishment or surrender for a period in excess of six months of the parental rights, duties, or privileges inherent in the parent-child relationship. Proof of desertion need not include the intention to desert, but is evidenced by the lack of attempted contact with the child or by only incidental contact with the child.

*Id.* § 232.2(15).

Here, the juvenile court found termination was proper under theories of both abandonment and desertion.

On appeal, the father challenges proof of abandonment but fails to address desertion. We find the State's contention the father waived any desertion challenge well-grounded. *See In re M.D.*, No. 11-2037, 2012 WL 474184, at *2 n.2 (Iowa Ct. App. Feb. 15, 2012) (noting but not deciding the question of whether a parent, "by arguing the evidence does not support a finding of *abandonment*, has waived any claim of error concerning the juvenile court's reliance in part on a finding of *desertion*"); *see also In re K.C.-P.*, No. 23-1730, 2024 WL 260829, at *1 (Iowa Ct. App. Jan. 24, 2024) (finding a father failed to mention one ground for termination, waiving his challenge to it). But we briefly address the issue given our resolution of the merits.

The record shows a history of desertion. The father was absent for almost all the child's life—far more than six months—due to a combination of incarceration

and failure to assume the role of a parent while not incarcerated. He relinquished the parenting function to the grandmother shortly after the child's birth and never assumed any parental responsibilities or duties thereafter. And while the father made limited efforts to communicate with the child shortly before termination, his conduct or choices led to his placement in segregation where he could have no real-time interactions by phone or video. The child's grandmother also testified the child "does not recognize him even. . . . [The child]'s, I guess, forgot him."

We agree with the juvenile court that the father's contact with the child was "intermittent" and the limited acts he did take to resume contact were insufficient to demonstrate he assumed parental rights, duties, or privileges or to otherwise undermine the strong evidence of his desertion. We also emphasize the father "cannot use his incarceration as justification for his lack of relationship with the child." *In re M.M.S.*, 502 N.W.2d 4, 8 (Iowa 1993). And we credit testimony by the grandmother and her paramour that the father did not provide financial support for the child while incarcerated or otherwise. We find clear and convincing evidence supports the termination of the father's parental rights to F.W. under section 232.116(1)(b) and affirm.

**Best interests.** The father asserts termination was not in the child's best interests. On review, we give primary weight "to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). Here, we agree with the juvenile court that termination is in the child's best interests. The father never cared for the child for any length of time, he is essentially a stranger to her, and he is not currently able to care for her. And

his substance-abuse and mental-health problems remain unaddressed. The child deserves the permanency and stability afforded by termination and potential adoption.

**Permissive exceptions.** Section 232.116(3) outlines five circumstances when the court may forgo termination after the State proves a ground for termination. The father urges the placement of the child in a guardianship with the grandmother should trigger an exception to termination under section 232.116(3)(a). But that exception is applicable only when "a relative has legal custody." *In re A.B.*, 956 N.W.2d 162, 170 (Iowa 2021). Because HHS removed the child from the grandmother's legal custody in early 2023 and the court placed the child in HHS's legal custody, the exception does not apply.

Section 232.116(3)(c) allows the juvenile court to decline termination if it "would be detrimental to the child at the time due to the closeness of the parent-child relationship." A parent resisting termination has the burden to prove this permissive exception by clear and convincing evidence, and our case law recognizes that—without more—neither a parent's love nor the mere existence of a bond is enough to prevent termination. *See A.B.*, 956 N.W.2d at 169–70; *In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010). The father claims he has a strong bond with the child because he sent letters and messages. Yet the juvenile court made a fact finding their bond was "minimal to nonexistent." This finding relies on implicit credibility determinations supported by the record. And even if there were a significant bond between the father and the child despite the father's almost complete absence from the child's life, any potential detriment caused by severing that bond is outweighed by the stability and safety afforded by termination and

adoption. *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (noting we consider the bond in the context of a case's unique circumstances and the child's best interests).

**Reasonable efforts.** The father also faults HHS for not providing reasonable efforts, specifically by facilitating visits between him and the child while he was incarcerated. Because we affirm under section 232.116(1)(b), HHS was not required to make reasonable efforts to reunify the father and the child. *See In re M.D.*, No. 19-1912, 2020 WL 567320, at *1 (Iowa Ct. App. Feb. 5, 2020) (collecting cases and noting "[i]n challenging the statutory grounds for termination, the father maintains DHS failed to make reasonable efforts to reunify him with [the child]. But section 232.116(1)(b) does not have a reasonable-efforts requirement."); *accord In re T.M.*, No. 23-1485, 2023 WL 7391834, at *1 (Iowa Ct. App. Nov. 8, 2023).

**Additional time.** The father last asks for another six months for reunification, asserting "he would be released from prison and could take the necessary steps to be able to care for" the child by then. But his own testimony at the termination trial, after a colloquy about the need for sobriety, stability, and a slow reintegration process with the child after release, indicated otherwise:

> Q. So if the court would extend this an additional six months, the possibility of the child being returned to you is not really a possibility at that time; correct? A. I don't see it, no. To be honest, I'm going to say no.

We believe the father's candid answer at trial was realistic. While he may hope for release from prison within six months of the trial date, even his own best-case-scenario puts his release in May 2024—at the edge of the six-month window, even

without accounting for the necessary period of sobriety in the community. We affirm denial of the request for additional time.

**AFFIRMED.**

Badding, J., concurs; Tabor, P.J., concurs specially.

**TABOR, Presiding Judge.** (concurring specially)

I agree with the majority's decision to affirm the termination of the father's parental rights. But I write separately to address the department's duty to make reasonable efforts to reunify children with their parents, even incarcerated parents. The majority declines to address the father's reasonable efforts challenge because the juvenile court terminated his rights under Iowa Code section 232.116(1)(b) (2023), "the child has been abandoned or deserted." I disagree that this ground for termination allows us to avoid a discussion of reasonable efforts.

True, we have a series of unpublished decisions noting that paragraph (b) does not have language implicating the reasonable-efforts requirement. *See In re M.D.*, No. 19-1912, 2020 WL 567320, at *1 (Iowa Ct. App. Feb. 5, 2020) (collecting cases). Those opinions trace their origin to *In re C.B.*, 611 N.W.2d 489 (Iowa 2000). *C.B.* is the source of these often-quoted sentences:

> [T]he reasonable efforts requirement is not viewed as a strict substantive requirement of termination. Instead, the scope of the efforts by the [department of health and human services] to reunify parent and child after removal impacts the burden of proving those elements of termination which require reunification efforts. *See In re B.K.K.,* 500 N.W.2d 54, 57 (Iowa 1993); *In re L.H.,* 480 N.W.2d 43, 46 (Iowa 1992). The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent.

*C.B.*, 611 N.W.2d at 493.

Quite frankly, I've always wondered why reasonable efforts are not viewed as "a strict substantive requirement" for termination. Because once the juvenile court transfers custody of a child to the department, the department must make reasonable efforts to return the child safely home. Iowa Code § 232.102(4)(b). Reasonable efforts at reunification are required in every case unless the court

waives the requirement. *Id.*; *In re L.M.W.,* 518 N.W.2d 804, 807 n. 1 (Iowa Ct. App. 1994) (noting reasonable efforts mandate requires agency to make reasonable efforts to reunify families "*in each case*" (emphasis in original)). Waiver of the department's reasonable-efforts requirement is only proper if the court "determines by clear and convincing evidence that aggravated circumstances exist supported by written findings of fact based upon evidence in the record." Iowa Code § 232.102A(4). One of those aggravating circumstances is that the parent has abandoned the child. *Id.* § 232.102A(4)(a). But in this case, the State did not allege aggravating circumstances. So reasonable efforts *were* a "strict substantive requirement" facing the department. Before the court granted the State's termination petition based on paragraph (b) and (e), the department had a responsibility to make reasonable efforts "to eliminate the need for removal" of F.W. or make it possible for her "to safely return to the family's home." *Id.* § 232.102A(1)(a) (defining reasonable efforts). Assuming the department did not meet that requirement, what enforcement mechanism would the father have?

It would be odd if the State could ignore "its statutory mandate to provide reunification services" to an incarcerated parent, *see In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000), and then petition to terminate that parent's rights because he had surrendered his parental duties by failing to have contact with the child. *See* Iowa Code § 232.2(15) (defining desertion). Indeed, in finding a "history of desertion" here, the majority emphasizes that the father's incarceration was the major contributor to his absence from F.W.'s life.

In my view, it is time for our supreme court to clarify the "strict substantive requirement" reference in *C.B.* and correct our court's practice of snubbing

reasonable-efforts claims in cases where the juvenile court terminates based on paragraph (b). But perhaps it already has done so implicitly. In addressing the case of an incarcerated mother—whose parental rights were terminated under section 232.116(1) paragraph (b), (e), and (h)—the supreme court addressed her reasonable-efforts argument, finding that her challenge to the lack of visitation in prison came too late. *In re L.M.*, 904 N.W.2d 835, 838, 840 n.9 (Iowa 2017) (noting that its rejection of mother's argument did not mean that reasonable efforts in furtherance of reunification cannot include visitation arrangements for incarcerated parents). Granted, the supreme court affirmed that termination under paragraph (h), *id.* at 839, but an appellate court's choice to analyze the proof under paragraph (b) cannot retroactively eliminate the department's duty to provide reasonable efforts.

Following the supreme court's lead in *L.M.*, I would address the father's reasonable-efforts challenge. In his petition on appeal, the father contends that he requested visits with F.W. in prison, but the department failed to provide them. The State argues in its response to the petition on appeal that the father waited too long to contest reasonable efforts. The father's first demand for additional services came in his brief resisting termination filed ten days before the hearing. Nothing in the father's petition on appeal points to an earlier request for prison visits with F.W. On this record, I would find that the father's request was untimely. *See L.M.*, 904 N.W.2d at 840.